Filed 5/22/14  In re R.M. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re R.M., a Person Coming Under the Juvenile Court Law. | D065035 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518455) |
| v. | |
| ABEL Q., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Cynthia Bashant, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Abel Q. appeals an order terminating reunification services in the juvenile dependency case of his minor daughter, R.M. He contends (1) the juvenile court did not comply with the notice provisions of the Indian Child Welfare Act (ICWA), title 25 United States Code section 1901 et seq.; (2) the juvenile court abused its discretion by not requiring notice to a nonfederally recognized Indian tribe under Welfare and Institutions Code, section 306.6;[1] and (3) substantial evidence does not support the juvenile court's finding under section 366.21, subdivision (g), that reasonable reunification services had been provided to him. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On June 29, 2012, the San Diego County Health and Human Services Agency (the Agency) petitioned the juvenile court under section 300, subdivision (a), on behalf of four-month-old R.M. The Agency alleged that Abel had beaten R.M.'s mother, Elizabeth M., in R.M.'s presence. During the beating, Abel kicked R.M.'s stroller, causing it to hit a wall. Elizabeth was taken to a hospital, where she was treated for cuts to her mouth and bruising on her face, eyes, lips, and nose. Abel was arrested at the scene by police, and Elizabeth obtained a criminal protective order prohibiting Abel from contacting or approaching her.

Abel and Elizabeth had a history of domestic violence. According to Elizabeth, Abel had previously slapped Elizabeth, thrown things at her, and raped her. The Agency had been providing voluntary services to Abel and Elizabeth at the time of the beating.

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Abel and Elizabeth failed to comply with those services or their safety plan. The Agency therefore concluded there was a substantial risk that R.M. would suffer serious physical harm in the future as a result of the ongoing violence between Abel and Elizabeth. At the detention hearing, the court found that the Agency had made a prima facie showing under section 300, subdivision (a), and ordered R.M. detained in out-of-home care.

At the jurisdiction and disposition hearing, Elizabeth submitted on the Agency's allegations. The court sustained the petition, declared R.M. a dependent of the court, removed her from Elizabeth's custody, and ordered reunification services for Elizabeth. R.M. was placed in a confidential foster home.

Because Abel was considered an alleged father, the court did not order reunification services for him. Abel remained in jail on charges related to the beating. An Agency social worker visited Abel and learned that he had participated in a videotaped anger management class there. Able would also be required to complete two 52-week courses on child abuse and domestic violence upon his release. The Agency provided referrals to a domestic violence treatment group, parenting education, and individual therapy. The Agency deferred any visitation between Abel and R.M. until the court determined that Abel was R.M.'s presumed father.

Paternity testing later revealed Abel to be R.M.'s biological father. The court amended the petition to reflect that fact. The court authorized visitation between Abel and R.M. according to the rules of the facility where Abel was incarcerated. The record does not reflect whether any such visitations occurred.

3

At the six-month review hearing, the court found that Elizabeth was making progress with her case plan and that R.M. would likely be returned to her. The court extended reunification services for Elizabeth. Abel was not present at the hearing, and it appears the Agency was having difficulty locating him. The minutes of that hearing reflect the court's finding that "THE AGENCY HAS EXERCISED DUE DILIGENCE IN TRYING TO LOCATE THE MINOR'S FATHER."

Abel was released from jail soon after the six-month review hearing. Abel went to the Agency unannounced and received referrals for parenting and domestic violence classes. Abel also contacted Elizabeth, in violation of her criminal protective order, and Elizabeth agreed to see him. While dropping R.M. off for an unsupervised visitation, R.M.'s foster mother observed bruising on Elizabeth and contacted the Agency. An Agency social worker went to the unsupervised visitation and discovered that Abel was there as well. The social worker told Abel he was violating the protective order and asked him to leave. After resisting initially, Abel did so.

Abel spoke with the social worker the next day. Abel said he simply wanted to see R.M., but the social worker explained that any visits had to be arranged through the Agency because of safety concerns. The social worker told Abel that any visitation would have to be separate from Elizabeth given the protective order. Abel was informed that his violation of the protective order had been reported to his federal probation

4

officer.[2]  The social worker provided Abel with the telephone number of his counsel and recommended that he seek out domestic violence groups in his area.  The Agency again provided referrals to domestic violence and parenting classes and told him to contact an additional service provider, South Bay Community Services.  The Agency also set a time and place for weekly supervised visitations between Abel and R.M.  Visitation occurred somewhat regularly over the ensuing weeks.  Abel began attending parenting classes and expressed interest in a domestic violence group.

Two months later, in April 2013, Abel requested that the court order reunification services for him.  The court found that Abel was R.M.'s presumed father, granted Abel's request, and ordered the Agency to provide services and a case plan through the 12-month review hearing.  Following the court's order, the Agency filed a proposed case plan that included Abel.  The case plan provided for a number of substantive service objectives, as well as participation in a domestic violence program, general counseling, and parenting education.  The court approved the case plan, and the Agency mailed the plan and service referrals to Abel.

The next week, an Agency social worker attempted to contact Abel and spoke with a case manager at Abel's residence.  The case manager reported that Abel had not followed up on the referrals, but he had attended parenting classes for the past two weeks.  The case manager said Abel was in danger of losing his residency there because he had quit his job.  Employment was a condition of the residence.

---

[2]     Abel was on federal probation based on a 2010 conviction for smuggling undocumented immigrants.

Within a few days, Abel was arrested at the Agency's offices for violating his federal parole. His arrest stemmed from his earlier violation of the criminal protective order. For the next two months, the Agency attempted to find where Abel was incarcerated, but was unable to do so. The Agency eventually found Abel and attempted to meet with him.

This time, Abel was incarcerated for approximately five months. Prison officials reported that Abel attended two sessions of a life skills class, though he did not start until several months into his incarceration. Other services were not offered at that facility at that time due to a lack of volunteer leaders.

After Abel's release, he met with an Agency social worker, who discussed his case plan with him and provided a list of parenting and domestic violence resources. Abel requested that visitation be resumed, and he later began attending a parenting class. The Agency and Abel's case manager attempted to enroll him in a domestic violence class as well.

At the 12-month review hearing, the Agency recommended that Abel's reunification services be terminated. The Agency opined that his participation in services was inconsistent, both inside and outside of prison, and he had not made progress in his case plan. The Agency determined that Elizabeth had made substantial progress and recommended that she receive an additional six months of services. The juvenile court adopted the Agency's recommendations, ordered six more months of services for Elizabeth, and terminated services for Abel.

6

The juvenile court also determined that ICWA did not apply to R.M.'s case and that reasonable efforts had been made to determine whether R.M. was an Indian child. Elizabeth did not claim any Indian heritage. Abel told the Agency at the outset of R.M.'s case that he may have some Indian heritage, but he could not identify a tribe. Abel did not know if any family members had been registered or eligible for enrollment with a tribe. No family members spoke an Indian language or participated in Indian cultural or political affairs. Neither Abel nor his parents lived on an Indian reservation or received services from a tribe.

Abel later stated that his ancestry may include the federally-recognized Navajo Tribe, as well as the Capistrano, Juaneño, and "Geronimo" Tribes. The Agency provided notice of R.M.'s dependency proceedings to the Bureau of Indian Affairs (BIA) and the Navajo Nation. The BIA confirmed that the Agency had established R.M.'s potential tribal affiliation and referred the agency to the tribe. The Navajo Nation's response stated that the Agency had provided insufficient information to determine R.M.'s tribal status. A number of months later, the Agency renoticed the BIA, the Navajo Nation, and the United States Department of the Interior. The Navajo Nation could not find any record of Abel's family and therefore determined that R.M. was not enrolled or eligible for enrollment with the Navajo Nation.

DISCUSSION

I

Abel first contends the juvenile court erred by not complying with the notice requirements of ICWA. Abel argues that his reference to the "Geronimo" Tribe should

7

have been interpreted as a reference to the Apache people because Geronimo was a well-known Apache warrior in American history. (See, e.g., *Geronimo v. Obama* (D.D.C. 2010) 725 F.Supp.2d 182, 184 [referring to Geronimo as "the legendary Apache warrior"].) Abel maintains that such a reference was sufficient to require notice of R.M.'s dependency case to each federally-recognized Apache Tribe.

"The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes and families." (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 469.) ICWA furthers these goals by establishing certain substantive and procedural standards for dependency proceedings involving an Indian child and by requiring notice to interested Indian tribes of their right to participate in such proceedings. (*In re K.P.* (2009) 175 Cal.App.4th 1, 4-5.) "The ICWA requires notice be given pursuant to its terms whenever 'the court knows or has reason to know' the child is an Indian child. (25 U.S.C. § 1912(a).)" (*In re Joseph P.* (2006) 140 Cal.App.4th 1524, 1529.)

Under ICWA, " 'Indian child' means any unmarried person who is under [18] and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) "The circumstances that may provide reason to know the child is an Indian child include, but are not limited to, the following:  [¶] (1) A person having an interest in the child . . . provides information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe.  [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is in a predominantly Indian community.

8

[¶] (3) The child or the child's family has received services or benefits from a tribe or services that are available to Indians from tribes or the federal government, such as the Indian Health Service."  (§ 224.3, subd. (b); see also Cal. Rules of Court, rule 5.481(b)(3).)

California courts have interpreted " 'reason to know' " as " 'reason to believe.' "  (*In re Joseph P., supra*, 140 Cal.App.4th at p. 1529.)  We "have set a low threshold to trigger the notice requirements of the federal law."  (*Ibid.*)  "A minimal showing that the child may be an Indian child is all that is required."  (*Id.* at p. 1530.)  "The determination of a child's Indian status is up to the tribe; therefore, the juvenile court needs only a suggestion of Indian ancestry to trigger the notice requirement.  [Citations.]  Both the court and the county welfare department have an affirmative duty to inquire whether a dependent child is or may be an Indian child.  [Citation.]"  (*In re Nikki R.* (2003) 106 Cal.App.4th 844, 848.)  Notice need not be given, however, "if there is insufficient reason to believe a child is an Indian child . . . ."  (*In re Shane G.* (2008) 166 Cal.App.4th 1532, 1538; see also *In re O.K.* (2003) 106 Cal.App.4th 152, 157.)

Here, Abel claimed heritage in the "Geronimo" Tribe through his mother and grandfather.  However, Abel did not know if any family members had been registered or eligible for enrollment with a tribe.  No family members spoke an Indian language, participated in Indian cultural or political affairs, attended an Indian school, lived on an Indian reservation, or received services from an Indian tribe.

On this record, there was not sufficient reason to believe that R.M. was either (a) a member of a federally-recognized Apache Tribe or (b) eligible for membership in a

federally-recognized Apache Tribe and the biological child of a member of such a tribe. (See 25 U.S.C. § 1903(4).)  Abel's reference to the "Geronimo" Tribe does not necessarily and directly evoke the Apache people, nor does it reflect that Abel (and thus R.M.) had any relationship with any Apache Tribe.  The vagueness of Abel's claim alone counsels against requiring notice here.  (See *In re O.K., supra*, 106 Cal.App.4th at p. 157 ["This information was too vague and speculative to give the juvenile court any reason to believe the minors might be Indian children."].)  Nothing in the record shows that Abel intended to claim ancestry in an Apache Tribe through his reference to a "Geronimo" Tribe.  Neither Abel nor his counsel brought up the possibility, in the juvenile court, that "Geronimo" might reference the Apache people.  Under these circumstances, we conclude the court was not required to order ICWA notice to the Apache Tribes.

We note that the Agency did not ignore R.M.'s potential Indian heritage.  The Agency spoke with Abel and Elizabeth about their ancestry and provided ICWA notice both to the federal government (BIA and U.S. Dept. of the Interior) and to the only federally-recognized tribe identified by Abel (the Navajo).  Moreover, in its notice to the BIA, the Agency stated that Abel claimed ancestry in the nonrecognized Capistrano, Juaneño, and "Geronimo" Tribes.

In light of our conclusion, we need not consider whether ICWA notice would have been necessary had Abel's reference to the "Geronimo" Tribe been equated with one or more of the federally-recognized Apache Tribes.  (Compare *In re Z.N.* (2009) 181 Cal.App.4th 282, 298 [notice not required where mother stated that "one of her grandmothers 'was Cherokee' and another 'part Apache' (tribes unidentified)"] with *In re*

10

*Damian C.* (2009) 178 Cal.App.4th 192, 199 [notice required where mother stated she may have Pasqua Yaqui ancestry and maternal grandfather stated his father may have been Yaqui or Navajo].)

II

Abel further contends that the juvenile court erred by not ordering notice on the Juaneño Band of Mission Indians (Juaneño Band).  Abel concedes that the Juaneño Band is not currently recognized by the federal government.  The juvenile court therefore had no obligation under ICWA to provide notice.  (See *In re K.P., supra*, 175 Cal.App.4th at pp. 5-6.)  However, Abel argues that the juvenile court abused its discretion under section 306.6 by not ordering notice on the Juaneño Band.  We disagree.

Section 306.6, subdivision (a) provides, in relevant part, as follows:  "In a dependency proceeding involving a child who would otherwise be an Indian child, . . . but is not an Indian child based on status of the child's tribe, . . . the court may permit the tribe from which the child is descended to participate in the proceeding upon request of the tribe."  "By its terms, the statute does not require that any notice be sent to a nonrecognized tribe.  [Citation.]  Further, the statute specifically does not apply either notice provisions found in the ICWA or provisions in state law implementing notice provisions of the ICWA to this situation.  [Citation.]"  (*In re A.C.* (2007) 155 Cal.App.4th 282, 286-287.)  "It is apparent that in enacting section 306.6, the Legislature had in mind the notice and substantive provisions of the ICWA but specifically chose *not* to require any notice beyond that already required by the ICWA, i.e., notice to federally recognized Indian tribes."  (*Id.* at p. 287.)

11

Because section 306.6 does not require notice to a nonrecognized tribe, the juvenile court here did not err in not ordering such notice. (See *In re A.C., supra*, 155 Cal.App.4th at p. 287.) Abel's claim that the Juaneño Band is currently seeking federal recognition and his reliance on a handout from the Judicial Council of California's Administrative Office of the Courts[3] do not affect this analysis or its application here.

III

Abel also contends the court erred in finding that the Agency had provided reasonable reunification services to Abel. Abel argues that the Agency's contact with him while incarcerated was inconsistent and that Abel had no real opportunity to work through his case plan.

"The legislative scheme contemplates immediate and intensive support services to reunify a family where a dependency disposition removes a child from parental custody." (*In re John B.* (1984) 159 Cal.App.3d 268, 274.) "Reunification services need not be perfect. [Citation.] But they should be tailored to the specific needs of the particular family. [Citation.] Services will be found reasonable if the [Agency] has 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved

---

3       Administrative Office of the Courts, Center for Families, Children, and the Courts, Following the Spirit of the Indian Child Welfare Act (ICWA) (undated) <http://www.courts.ca.gov/documents/Tribal-FollowSpiritICWA.pdf> (as of May 19, 2014).

difficult (such as helping to provide transportation . . . ).' [Citation.]" (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972-973.)

"[I]n reviewing the reasonableness of the reunification services provided by the [Agency], we must also recognize that in most cases more services might have been provided, and the services which are provided are often imperfect. The standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969 (*Elijah R.*).)

"When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence." (*In re Alvin R., supra*, 108 Cal.App.4th at p. 971.) We view the evidence in the light most favorable to the Agency and draw all reasonable inferences in support of the juvenile court's finding. (*Ibid.*; see also *In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)

Here, Abel was initially found to be R.M.'s alleged father. "Only a presumed father, however, is entitled to reunification services." (*Glen C. v. Superior Court* (2000) 78 Cal.App.4th 570, 584.) Abel was not found to be a presumed father until nine months into R.M.'s dependency case, when he requested services. Nonetheless, the Agency had been providing him with services pursuant to a voluntary case plan for over a year prior to that point, as well as specific referrals to additional resources during R.M.'s dependency case. These services included domestic violence classes and parenting education.

When Abel was declared R.M.'s presumed father, the Agency drafted a formal case plan for Abel addressing the reasons for R.M.'s removal, including components such as domestic violence and parenting classes. Abel does not argue the substantive components of the case plan were inadequate, and we conclude they were reasonable under the circumstances.

The Agency mailed the case plan and appropriate service referrals to Abel. The next week, the Agency attempted to contact Abel by telephone. Abel was not available, but the Agency spoke to the case manager at Abel's residence about his participation in services. Two days later, Abel was arrested for his earlier violation of the criminal protective order requiring him to stay away from Elizabeth. The Agency was unable to reach Abel during the first two months of his incarceration, but the record shows that the Agency made reasonable efforts to locate him. These efforts included searching for Abel on the Federal Bureau of Prisons Web site, contacting Abel's federal probation officer, and attempting to telephone the United States Marshal's Service several times.

When the Agency located Abel, a social worker went to Abel's facility to visit him but was unable to do so. The facility required the social worker to submit a written request for visitation. The social worker complied, but the facility does not appear to have responded. The social worker then called the facility twice, eventually determining that Abel had been transferred to another facility. The social worker contacted the second facility and obtained information about the services available and Abel's participation. Although the facility offered weekly life skills classes, Abel did not begin attending until several months into his incarceration there. When Abel was released, he

14

met with an Agency social worker about his case plan. Abel received referrals to services again, and the Agency attempted to enroll him in a domestic violence course.

Abel claims the services he was provided were "neither immediate nor intensive." (See *In re Kristin W.* (1990) 222 Cal.App.3d 234, 254.) But the record shows that the Agency immediately provided Abel with an appropriate case plan and referrals after the court ordered reunification services. The Agency then appropriately followed up with telephone contact. The Agency's efforts were interrupted by Abel's own incarceration for violation of the criminal protective order. Abel's subsequent inability to access the Agency's services or proceed with his case plan was therefore the result of his own actions. (See *Elijah R., supra*, 66 Cal.App.4th at p. 971 ["By his own actions, [father] thus placed himself out of the reach of any meaningful rehabilitative services which the [Agency] could have provided."].) Moreover, while incarcerated, Abel did not fully take part in the services available to him.

When Abel was released, the Agency promptly began providing its services again. The fact that there was insufficient time left in Abel's case plan was again the result of his own actions that resulted in his five-month incarceration. (*Elijah R., supra*, 66 Cal.App.4th at p. 971.) Contrary to Abel's claim, the fact that R.M.'s mother, Elizabeth, was provided further services, while Abel's services were terminated, does not demonstrate error. The circumstances of the two parents were materially different. Substantial evidence supports the trial court's finding that reasonable services had been provided to Abel.

DISPOSITION

The order is affirmed.

McCONNELL, P. J.

WE CONCUR:


BENKE, J.


AARON, J.